UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RICHARD R. BRILINSKI ,
TRUSTEE OF THE RICHARD R. BRILINSKI
LIVING TRUST, U/A/D 12/23/02,

                Plaintiff,                          Case No. 14-cv-10015

v.                                                  Honorable Thomas L. Ludington

MERIT ENERGY COMPANY, LLC,
PETROLEUM DEVELOPMENT CORPORATION,
and JET EXPLORATION 1995-1, LLC,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR
SUMMARY JUDGMENT**

      This case was initiated when Plaintiff Richard Brilinski filed a complaint against Defendants Merit Energy Company, Petroleum Development Corporation, and Jet Exploration[1] in Alcona County Circuit Court. ECF No. 1. Defendants removed the case to this Court on January 2, 2014. *Id*. On October 10, 2014, Defendants filed a motion for summary judgment which they then amended on October 20, 2014. ECF Nos. 13, 16. Defendants claim that summary judgment should be entered against Brilinski because his claims are barred by the doctrine of laches or, in the alternative, the applicable statute of limitations. *See* ECF No. 16. Because the relevant statute of limitation governing Brilinski's action applies, and has lapsed, his claim is barred and summary judgment is appropriate.

---

[1] Defendant Jet Exploration is, by all accounts, defunct and no longer operating. Any reference to Defendants made herein refers to Merit and PDC, unless otherwise indicated.

**I.**

Plaintiff Brilinski brings this suit as the trustee of the Richard R. Brilinski Living Trust ("Trust"). ECF No. 1 at 10. The Trust, and Brilinski as trustee, "owns land situated in Caledonia Township, Alcona County, Michigan." *Id*. Brilinski owns both the surface and mineral rights to his land, which covers 80 acres. ECF No. 16 at 16.

**A.**

An Antrim Shale deposit lies under Brilinski's land and the tracts surrounding his. In 1997, Jet Exploration began acquiring mineral leases from landholders in the area in order to create an Antrim drilling unit. *Id*. This unit eventually came to be known as the Timm Antrim Unit. ECF No. 1 at 11. The unit consists of 21 natural gas wells.[2] ECF No. 1 at 11.

**B.**

When the unit was being formed, a representative of Jet approached landowners in the area in an attempt to secure mineral leases. One of the landowners approached was Brilinski. ECF No. 20 at 13. The royalty payment being offered by Jet was not satisfactory to Brilinski and so he "attempted in good faith to negotiate a higher royalty payment than was being offered[.] *Id*. An agreement could not be reached, however, and so Brilinski did not join the Antrim unit.[3] *Id*.

---

[2] The well in question, the Hansen C3-10 well, has been capped off and plugged. As a result, it is no longer producing gas.

[3] Brilinski claims that he was only offered a mineral lease, not an opportunity to join the drilling unit. ECF No. 20 at 13 ("Contrary to Defendant's assertion, Plaintiff was never asked to join the Timm Unit; what he was asked to do was sign an oil and gas lease."). But the distinction Brilinski attempts to make is unclear. Perhaps he only means to claim that he had no knowledge that the specific Timm Antrim Unit would be formed from the leases, but that is a distinction without a difference because he surely knew he was executing a lease to a part of a larger gas exploitation unit. He states in his deposition:

> This guy comes into my house to get me to sign an oil lease with his company. . . . I told him I wanted one-sixth. I didn't want one-eighth, I wanted one-sixth, with no costs taken out of it for my gas. He said, "No, we can't do that. Everybody's getting one-eighth, and they have to pay one-eighth. Everybody's getting the same." And I said, "Well, I'm not going for it."

> And he told me if I didn't sign that one-eighth lease, he was going to drain me. He said, "We'll take your gas anyway. And you might as well get something out of it." And I said, "Well, I'm not signing that one-eighth lease. If the State of Michigan can get one-sixth with no cost, my gas is

According to Brilinski, when discussion regarding executing a lease fell through "[t]he landman . . . threatened . . . that [Jet] would drain his lands of the underlying oil and gas." *Id*.; *see also id*., Ex. 1 at 60.

### C.

Because Brilinski declined to execute a lease to be a part of the soon-to-be-created Timm Antrim Unit, no wells were drilled on his land. Instead, three wells were drilled on adjacent parcels, near to Brilinski's property line. *Id*. at 13. The three wells were drilled on the Gillard, Hansen, and Bushey properties to the west, north, and east of Brilinski's land, respectively. ECF No. 20, Ex. 3.

The Michigan Supervisor of Wells has imposed a requirement that any wells drilled on a tract of land cannot be within 330 feet of the property line of an adjoining tract that is outside the drilling unit. Order of the Supervisor of Wells, Order No. (a) 14-9-94. Brilinski claims in his deposition that when the three wells were staked for drilling he had suspicions about whether they were drilled in conformity with the 330 foot setback. With respect to the Hansen well he stated that he "saw where the stake was and [he] walked over there and stepped it off, to make sure they were 330 feet from my line." ECF No. 20, Ex 1 at 33. By utilizing this method of measurement—estimating that each of his steps was three feet long over the course of 100 steps—Brilinski decided he "didn't have nothing [sic] to worry about; that the well was beyond the 330-foot mark." *Id*.

---

worth just as much as the State's is." And that was my response to him. And then he went about going around there with his little wheel and putting stakes in the ground all over the place to make me feel threatened.

ECF No. 20, Ex. 1 at 60-61. It is difficult to construe this portion of Brilinski's deposition in a manner that permits concluding he was unaware that he was being offered a position in a future drilling unit.

At this time Brilinski also had suspicions about the other two wells, in particular the Gillard well, to the west of his property. *See* ECF No. 16, Ex. 1 at 51. Brilinski's suspicions about the well were raised "because ther[e was] a 15-foot differential in the fence line and a new survey line that they had put in there." *Id*. at 51-52. That is, Brilinski was concerned that the oil company surveyor staked the property line in a manner that was 15 feet inconsistent with his understanding of the property line. This occurred in 1998. *Id*. at 53. Brilinski, however, did not contact the state and begin inquiries on the discrepancy until 2012. *Id*. at 53-54. This was despite the fact that he "figured that if they were going by their survey rather than the fence line, that that well would be in violation." *Id*. at 59.

## D.

During the period between 1998, and 2012 when Brilinski was informed by the Michigan Department of Environmental Quality ("MDEQ") that the Hansen well violated the setback, Brilinski did little meaningful investigation into the location of the three wells. Brilinski testified that during that period he called his state representative and state senator about the possibility that the wells were improperly drilled. When he did not hear back, however, he did not further pursue the matter. According to Brilinski he "waited for them to call [him] back . . . but [he] wasn't going to make it a priority[.]" ECF No. 20, Ex. 1 at 54-55. This is despite the fact that Brilinski "had suspicions" about "all three of those [wells] that border [his] land." ECF No. 16, Ex. 1 at 96-97.

Eventually, Brilinski learned from a third party (his daughter, he believes) that the proper path for his inquiries was through the MDEQ. ECF No. 16, Ex. 1 at 53. This was in 2012. Id. It was at this point that he was able to learn from the MDEQ that the Gillard well, which he "just figured . . . would be in violation", *Id*. at 59, was actually compliant with the setback, but the

Hansen well was in violation of the setback. *Id*. at 58. After learning of this violation, Brilinski initiated the current action in Alcona County Circuit Court on November 7, 2013. ECF No. 1.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.

Defendants make two primary claims in their motion for summary judgment. First, they claim that all of Brilinski's claims are barred by the doctrine of laches. Second, they claim that the applicable statute of limitations operate to bar all of Brilinski's claims. Because the statute of limitations is, as its name implies, statutory, rather than equitable, like laches, it will be analyzed first. Under Michigan law, "[t]he doctrine of laches will not ordinarily apply if a statute of limitations will bar a claim because laches is viewed as the equitable counterpart to the statute of limitations." *See Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 863 (Mich. Ct. App. 2008). For the sake of completion, however, Defendants' laches claim will also be analyzed.

### A.

Under Michigan law, when "deciding which period of limitations controls, [a court] must first determine the true nature of the claim." *Adams v. Adams*, 742 N.W.2d 399, 403 (Mich. Ct. App. 2007). "The type of interest allegedly harmed is the focal point in determining which limitation period controls." *Id*. (quoting *Simmons v. Apex Drug Stores, Inc.*, 506 N.W.2d 562, 564 (Mich. Ct. App. 1993)). A court must "read the complaint as a whole, and . . . look[] beyond mere procedural labels to determine the exact nature of the claim." *Id*. The gravamen of the action determines what limitations period controls.

Brilinski's first claim is for conversion. A three year statute of limitations governs claims for injury to person or property. Mich. Comp. Laws Ann. § 600.5805(10). Michigan law treats claims of conversion as a claim for injury to person or property governed by this three year limit on actions. *See Tillman v. Great Lakes Truck Ctr., Inc.*, 742 N.W.2d 622, 623-24 (Mich. Ct. App. 2007) (applying Michigan Supreme Court precedent in affirming application of three year statute of limitations to conversion action).

- 6 -

But Brilinski's complaint also alleges a claim of unjust enrichment. Proving a claim of unjust enrichment requires showing: "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993). Where there is no contract covering the subject matter, "the law operates to imply a contract in order to prevent unjust enrichment." *Id*. Thus, a claim for unjust enrichment sounds in contract. Contract claims are governed by a six year limitations period. Mich. Comp. Laws Ann. § 600.5813.

The two claims are not, however, governed by two different limitations periods. As advised above, a court must determine the gravamen of the complaint and apply the appropriate limitations period to the harm alleged. *Adams*, 742 N.W.2d at 403. Here, Brilinski's claim is that Defendants drilled a gas well within the 330 foot buffer zone around his property line which led to the drainage of gas from his land. Such claims have been consistently held to be claims of conversion. *See, e.g.*, *Ross v. Damm*, 270 N.W. 722, 725 (Mich. 1936) ("From these facts we conclude that defendants by drilling their  wells too close to the [property] line . . . deprived plaintiff of the opportunity of claiming and taking the oil that was rightfully hers; and defendants must respond in damages for such conversion."). Thus, the gravamen of Brilinski's complaint is for conversion and his claims are controlled by a three year statute of limitations.

Applying the three year statute of limitations to Brilinski's complaint operates to bar his claims as untimely brought. The statute of limitations looks at nothing more than the time a claim accrues to determine the operative date of the limitations period. Since the Hansen well was drilled in 1998, the clock on Brilinski's claim began running then and the three years he had in which to bring his claim expired in 2001.

Brilinski claims, in response, that the statute of limitations was tolled by the 'discovery rule.' ECF No. 20 at 8-10. As Defendants point out, however, the discovery rule has been explicitly abrogated by the Michigan Supreme Court in *Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 672 (2007). Tolling by discovery only occurs "where [the Michigan Legislature] sees fit." *Id.* No tolling provision is contained within the applicable statute of limitations for cases of injury to property. Since nothing tolls the limitations period applicable to Brilinski's cause of action, it is barred as untimely.

## B.

Defendants also argue that all of Brilinski's claims are barred by the doctrine of laches. As noted above, this is the Defendants' primary claim. Under Michigan law, however, it is subsidiary to any applicable statute of limitations. Furthermore, absent exceptional circumstances, laches will only apply where there is no statute of limitations applicable to the action because it "is not a defense that ordinarily should be addressed if a statute of limitations will bar a claim." *Eberhard v. Harper-Grace Hospitals*, 445 N.W.2d 469, 474 (Mich. Ct. App. 1989). In this instance, where Brilinski does not demonstrate any reason why the statute of limitations should not apply, laches does not apply of its own force. Thus, this analysis is done in the alternative.

Laches is a "judicially-imposed equitable principle" that "denotes the passage of time combined with a change in condition which would make it inequitable to enforce a claim against the defendant." *Lothian v. City of Detroit*, 324 N.W.2d 9, 13-14 (Mich. 1982) (internal quotation marks omitted). Laches traditionally operates only on certain equitable claims—generally those not governed by a statute of limitations—but has also been applied to actions at law. *Eberhard*, 445 N.W.2d at 474. "For laches to apply, inexcusable delay in bringing suit must have resulted in

prejudice" to the defendant. *Tenneco*, 761 N.W.2d at 864. "Unlike the statute of limitations, which is concerned with the fact of delay, the concern of laches is the effect of delay." *Eberhard*, 445 N.W.2d at 475. The most important inquiry, then, is whether Defendants were prejudiced by the delay.

The precedent inquiry, however, must establish that there was indeed an inexcusable delay. "The mere lapse of time . . . is not sufficient to constitute laches." *Bayley v. Friedberg*, 197 N.W. 559, 560 (Mich. 1924). If the plaintiff's delay in moving can be explained and accounted for, relief may be granted despite the delay. *Id.* But the Supreme Court has established that "where the question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston v. Standard Min. Co.*, 148 U.S. 360, 370 (1893). The question presented by this case is whether the fact of drilling on adjacent land near to the property line should have put Brilinski on notice of his potential claim.

The courts of Michigan have yet to address whether the existence of adjacent-property wells is sufficient to put a landholder on notice that those wells may be drilled within the state-mandated setback requirement. This precise issue has, however, been examined by the Texas Supreme Court, *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998), and endorsed by the Fifth Circuit, *Target Strike, Inc. v. Marston & Marston, Inc.*, 524 F. App'x 939, 944-45 (5th Cir. 2013). In *HECI*, the Texas Supreme Court held that:

> [O]wners of an interest in [a] mineral estate . . . [have] some obligation to exercise reasonable diligence in protecting their interests. This includes exercising reasonable diligence in determining whether adjoining operators have inflicted damage. Royalty owners cannot be oblivious to the existence of other operators in the area or the existence of a common reservoir. In some cases, wells visible on neighboring properties may put royalty owners on inquiry. In any event, a royalty owner should determine whether a common reservoir underlies its lease because it

knows or should know that, when there are other wells drilled in a common reservoir, there is the potential for drainage or damage to the reservoir.

*HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). This position is both reasonable and not inconsistent with Michigan law regarding the affirmative defense of laches.

Under the rule set forth in *HECI*, Brilinski was on notice of the potential for drainage to his lands. While he is not a royalty owner, he was just as informed about the status of his land and the surrounding drilling unit. He could see all three of the wells constructed around his property and was immediately concerned about whether they were drilled within the legally mandated setback. Further, although Brilinski makes much of the "threat" from the landman, it did serve to, at a minimum, inform Brilinski that there was a common reservoir under the unit and that his land was susceptible to drainage.

Furthermore, Brilinski had actual suspicion regarding the setback of the three wells. He was even suspicious enough of the Hanson Well to "walk it off"—that is, walk from his property line to the well estimating how far the distance is on that basis. But "walking off" a well is not the type of zeal and diligence asked of a property owner where suspicions of encroachment or drainage are aroused. As the Supreme Court observed over a century ago:

> There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which to-day may have no salable value may in a month become worth its millions. Years may be spent in working such property, apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.

*Patterson v. Hewitt*, 195 U.S. 309, 321 (1904). This admonition carries just as much force today. Brilinski, if truly concerned about the placement of the Hanson Well, would have done more than walk-off an approximate distance. But as Brilinski noted in his deposition "wasn't going to

- 10 -

make it a priority[.]" ECF No. 16, Ex. 1 at 55. The delay occasioned by Brilinski's decision not to prioritize the issue is not excusable.

The inquiry now becomes what the effect of the delay was on Defendants and if they were prejudiced thereby. The concern when analyzing prejudice is the possibility that a defendant is forced to defend against a stale claim. *Lothian*, 324 N.W.2d 9, 17 (Mich. 1982). Pursuant to this concern, an aged claim not diligently brought and prosecuted will prejudice a defendant where the ability of a defendant to gather and present fact evidence has diminished. *See Matter of F. Yeager Bridge & Culvert Co.*, 389 N.W.2d 99, 105 (Mich. Ct. App. 1986). Forcing a party to uncover stale evidence is particularly compelling here where the company that originally drilled the wells and unitized the properties is now defunct. The drilling operation has been sold in the intervening years and retrieving evidence of the original sale and the plans for drilling the Hanson Well would impose an undue burden on Defendants.

Furthermore, the very nature of the risk in a mineral-extraction venture counsels against allowing aged causes of action to proceed. As the Supreme Court admonished:

> The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.

*Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 593 (1875). Here, Brilinski's claim falls squarely within this rationale. Allowing him to enter the unit at this late date, or even to pursue his claim seeking entry into the unit, would place the entirety of the risk of loss on Defendants as the unit matured over the years. It should also not be forgotten that Brilinski had the opportunity to join the unit but declined when he could not extract an increased royalty fee.

Brilinski answers these inequities by claiming that Defendants have unclean hands and so are themselves barred from reliance on laches. He makes two claims in this respect. First, he

- 11 -

claims that the papers filed with the MDEQ are inconsistent and in at least one area indicate that Brilinski's lands are under lease in the Timm-Antrim Unit. Second, he claims that Defendants should have gone to the Supervisor of Wells and forced him into the pool after he declined to join. Neither of these arguments have merit.

First, Brilinski argues that the unitization agreement has an internal inconsistency. He alleges that Exhibit A, the list of all the leased properties in the unit, does not include Brilinski's lands (appropriately, since he declined to sign a lease) but Exhibit B, the geographic area encompassed by the unit, includes a section that has within it Brilinski's lands. While Brilinski is correct in his description of the two exhibits he does not explain what exactly the upshot of this purported discrepancy is and how exactly it is a discrepancy. Rather, the first page of the unitization agreement makes plain that the leases listed in Exhibit A are the operative leases in the unit which gave, at the time, Jet and PDC the authority to conduct gas extraction operations. Exhibit B, as also described on that page, merely describes the geographic area that Jet and PDC sought to include in an authorized unit. Thus, the fact that Brilinski's land is encompassed in the Exhibit B description, but not listed as a leased parcel in Exhibit A is entirely consistent with his choice not to enter into a unitization lease.

Brilinski's next claim is that Jet and PDC, at the time the unit was formed, should have petitioned the Supervisor of Wells to force him to be pooled into the Timm-Antrim Unit. ECF No. 20 at 8. Brilinski admits, however, that "there is no guarantee that the request would have been granted[.]" *Id*. Brilinski also does not offer any authority supporting the proposition that not taking such a drastic action amounts to unclean hands. According to Brilinski, Jet and PDC's approach was to "drill, and as long [as they] met the setback requirements drain Plaintiff's lands and nothing could be done about it." *Id*. But, Brilinski had affirmatively declined participation in

the Unit when he could not secure a higher royalty rate. It is unclear how lawfully drilling, as it was supposed at the time, at or beyond the setback and not force-pooling Brilinski could amount to an equitable bar on Defendants' ability to assert the laches defense. Brilinski offers no such solutions and is unable to show that Defendants did indeed have unclean hands.

Because Brilinski's delay in bringing his claim is inexcusable and because allowing his claim would prejudice Defendants, his claims, as they relate to the drilling of the Hanson well, are barred by laches.

**IV.**

Lastly, the issue of Jet Exploration's presence in the case must be addressed. Both sides agree that Jet is defunct and no longer a going concern. *See* ECF No. 1 at 3, 13, & Ex. 4. Jet dissolved in 2000 by the consent of its members. *Id*., Ex. 4. Brilinski has not effectuated service on any entity purporting to be Jet. The summons has expired and Brilinski has proceeded to the merits of the case against Merit and PDC. As a result, the action against Jet is ripe for dismissal for want of prosecution. Jet's involvement in the case will be terminated along with the other Defendants.

Furthermore, and in the alternative, while Jet did not join in Merit and PDC's Motion for Summary Judgment, as established above, all of Brilinski's claims related to the drilling of the Hanson Well are barred by either the applicable statute of limitations or laches. Thus, any claims Brilinski could maintain against the defunct Jet would be similarly barred.

**IV.**

Accordingly, it is **ORDERED** that Defendants' Amended Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

- 13 -

It is further **ORDERED** that Plaintiff's complaint, *see* ECF No. 1, is **DISMISSED** with prejudice as to all Defendants. This is a final order and closes the case.

Dated: January 30, 2015                          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 30, 2015.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS